We will now turn to our fourth case today, Inendino v. Nance-Holt. We will hear from Ms. Herrera. Good morning, and may it please the Court. In 1791, the United States ratified the First Amendment, guaranteeing freedom of speech. How does the government violate our rights to free speech? Some ways are like an arrest or a conviction for speech or prior restraints. You may not publish this. But there is another way, the one at issue here, and that is the termination of government employment. Sam Inendino worked for the Chicago Fire Department for 16 years without any incident of any discipline. In his capacity as a fireman, his job duties included fighting fires, saving lives, and providing medical treatment as an EMT. The city of Chicago, through Nance-Holt and Brian Casey, used the fact of Sam Inendino's employment to retaliate against him for speech that they did not like. This violates the First Amendment, and the lower court erred when it found otherwise. There can be no real argument that the government could have retaliated against Sam Inendino for the speech that he engaged in in any other fashion. There is no world in which he could have been arrested, no world in which we could have passed an ordinance telling him he could not post those things. The only way that the government had in this instance to retaliate against him for his speech was his employment. Pickering v. Board of Education of Will County decided in 1968, instructs us that this is illegal. If the employer cannot point to some harm that the speech caused, either to the speaker's performance or to the work environment. The lower court made three major errors. The first is that it made value judgments on Sam's speech. The second is that it failed to consider disputed evidence that Sam's termination was in fact viewpoint retaliation. And number three, the lower court did not properly consider the seven Pickering factors. On the first point, the lower court wrongfully made value judgments about Sam Inendino's speech. The court repeatedly referred to the fact that the Facebook posts had no value, according to the lower court. The lower court emphasized that the speech, according to him, was full of hate and advocacy for violence. The government is not allowed to engage in viewpoint discrimination. The word hateful is subjective. Is it hateful to chant from the river to the sea, Palestine shall be free? Some people say that it is. Others say that it is not. Hateful is a subjective term which never should have been used in the lower court's decision making. There is no hate speech exception to the First Amendment. This is clear. There is also no praising of violence exception to the First Amendment. In the Rankin v. McPherson case, the employee in that case said that if the assassin goes for Reagan again, I hope that they get him. That is certainly speech that a wide variety of people at that time and now would find offensive. But the court found in that case that that is still protected speech. Ms. Herrera, the first threshold question is whether or not the posts addressed matters of public concern. There are a number of posts, all the posts that were the basis for Mr. Nandito's termination are set forth in the OIG investigation report. I have questions about some particular ones. With regard to the first one, the picture with the title Real Housewives of Public Housing, can you tell me how that post relates to a matter of public concern or at least how a reasonable person might view that post as related to a matter of public concern? Yes. Judge, you referenced it being the first one. I just want to make sure we're talking about the same thing, the one that says Real Housewives of Public Housing dated October 5, 2020? Yes. Okay, thank you. Your Honor, the phrase matter of public concern means an item of political news or an item of interest to the public. There's basically two aspects to this meme. One is the fact of the Real Housewives television series, which is a show watched by a lot of people. The other aspect to it is public housing. There's perhaps a third aspect, who lives in public housing? What do we think about public housing? These are all items of matters of public concern. That phrase, matter of public concern, was originally developed to distinguish from just a private employee grievance. When that phrase has been used, it's often sometimes misused. A matter of public concern means anything that's not just this employee's private problem. For example— Anything? Judge, I would argue anything that isn't related to just this public employee's grievance about his work, any item of political news interest. Judge, let me qualify that. Right. As I understand it, it's a reasonable person standard, right? So it's whether a reasonable viewer would look at the communication and think that it related to a matter of public concern. I disagree with that, Judge. Is it a subjective evaluation? Is it whether or not Mr. Inandino thought it related to a matter of public concern? No, it's a legal question to be decided by the judge. So my question is, what standard is that? Is it a reasonable person standard then? No. It's not a reasonable person standard. It is for the court to determine, and it depends on the context, which is very important here. If the comments happened at work, Your Honor, then it wouldn't be that everything is an item protected by the First Amendment. So, for example, if here in the courthouse someone was talking about how they don't like a particular vegetable and someone else got angry, that does not get First Amendment protection. Inside the workplace, employers are allowed to regulate their workplace. There's actually not much First Amendment protection there. But when someone is speaking outside of their workplace and they're not speaking about work, the employer carries a heavy burden to prove that speech that's occurring outside the workplace and not about work is something that the government is allowed to regulate. And the case law is clear that they can't do that. A good example is the Harnisch-Vega case, Your Honor, from this Seventh Circuit. The Harnisch-Vega case involved a woman that worked for the National Guard who published a book about her life as a sex operator through a phone line. And part of what she published in her book was to say, you know, these men that I spoke to are disgusting. They should kill themselves. That was what she put in her book. The National Guard determined, put forth the same arguments the city puts forth here. These are disgusting points of view. This isn't appropriate for us. This makes us look bad. This isn't good for our image. These are the exact same arguments that the city defendants put forth here that what Sam posted on Facebook is bad for CFD's image. Employers aren't allowed to do that. I thought that the whole point of the Pickering balancing is to determine when employers could do that, right? So the question really kind of boils down to what were the employees' responsibilities and duties and scope of employment and how does the challenged speech impact, if it does at all, the performance of those duties? Those are some of the factors that we are to consider when we engage in the Pickering balance after we determine first whether or not the communication is related to a matter of public concern. So it seems like the absolute statement that you made that employers cannot regulate, at any event, any speech that an employee conducts or a public employer, any speech that a person conducts outside once they step out of the workplace seems to be kind of hyperbolic in my mind. If the speech were related to work, I would agree with you. Or the speech would impact the individual's ability to perform their work. That's where I start to disagree with you, Judge. So for example, in all of the cases involving police officers and correctional officers, one of the things that the courts really looked at and what we've looked at is what impact the speech would have on the ability of the employer to regulate the work that its employees do. And so here, Mr. Indino, and this is kind of the friction that I find in this case. Mr. Indino's work involved him going out into the community and helping people, which I understand from the letters submitted by his colleagues and whatnot, that he was quite good at. But the fact is that it seems to me any conduct or communications that he sets out, even outside the workplace, that might impact his ability to perform his work and the ability of the public to trust that he's performing his work well and without favor seems like relevant considerations that the government employer can take. And so I wonder why that's not the right way to look at it here. I would say a few things there, Your Honor. Those contacts in Schneider v. Carr and Hicks were police environments. The Chicago Fire Department is not a police environment. I think there's an important distinction between police and corrections and fire. They're not the same. Moreover, both of the plaintiffs in those cases were supervisors who had the ability to set policies and manage employees. So there's several important factual distinctions from those cases to this case. I think the phrase that the employer might, that it might cause a problem with people people might not trust him is exactly the sort of conjecture which the Supreme Court has rejected. Employers are not allowed to rely on rank speculation or conjecture to say that people might have an issue with this. Consider the McPherson case where the young woman said, But the employee doesn't have to wait until something bad happens. I mean, that's what we've said in countless other cases, that even in those police officer and correctional officers' cases, that the employee doesn't have to wait until something bad happens if there's a reasonable probability, a reasonable estimation that it might happen. Here it had been 20 months. So from his first speech on Facebook... So now you're not arguing with the test. You're arguing with the application of the test to the facts of this case. The test is whether the employer had proof of actual problems with operations, which they didn't have and they don't claim they did. All that they claim to have is a fear that some citizen might not like him. There were 20 months that passed between the time of his initial speech and when he was fired, 8 months that passed. And between his last item of speech, if you look at the last meme posted, it was October of 2020. He was not terminated until June of 2021. The employer during that time had no evidence. The city can point to nothing except for its own beliefs that somebody might not like Sam in Endino's speech. And your plaintiff disagrees that any of the memes would suggest to any member of the public that Sam in Endino would not save their life or give them medical treatment or rescue them from a fire. None of those implicate that. This would be a different case if the meme said something like, I'm a fireman. I will not rescue you if you're not my race or something like that. It would be a totally different case. That's not what happened here. Sam in Endino posted memes on items of political news that his bosses disagreed with. They didn't like them, and they fired him for those. I see I'm out of time. I apologize. Any questions? Thank you, Ms. Herrera. We'll give you some time on rebuttal. Thank you. I appreciate it. Thank you. Ms. Chapman, if I might just. May it please the Court. Go ahead. Ms. Herrera seems to make a good point that perhaps the district court here did make a value judgment with regard to the validity of the comments or posts by Mr. in Endino and whether or not they contributed constructively to the public dialogue. To me, that seems very close to being some sort of judgment with regard to the value of the content of the speech. Is that permissible in this context when we're trying to figure out the first step of the Pickering balance, that is whether or not the communications raised a matter of public concern? At its core, not necessarily. And I would say to the extent that the district court did render value judgments, it was looking more so at the absence of value. So, for example, a statement. But isn't the absence of value basically the flip side? I mean, whether you decide something has value or not, that in itself is a value judgment. I would say not even the absence of value, but the absence of content. So the question under Pickering Step 1, under Connick, is we're going to look at what was the point of the speech. We need to look at the content, the context, and the form. And so when you take Mr. Inandino's, we're going to call them, insults to the public, telling them that their welfare, F words, with scumbag kids, the judge looked at that and said, I don't know what matter of public concern I'm gleaning any information about here. Yes, there's the word welfare. Yes, there's the word kids. Yes, he told some individuals he did not know to take their ass back over the border where they belong. He did not report to be speaking on topics of immigration and welfare. I think there he says he's talking about gleece force. So in congruence between his own explanations, the words he used, and what a reasonable person could look at and say what was the point of that speech leads to the objective conclusion that that was not speech on matters of public concern. All right. What about some of these other posts? There's one post on page seven of the OIG report, the one that says if black lives really mattered, and then 94% of all blacks shot are shot by blacks. And Mr. Inandino, I think he basically posted that or reposted it. Why wouldn't that communication address a matter of public concern, whether or not you agreed with it? I would argue that's much closer to the line. I think that one really implicates pickering, the second step, more so than conic. And it really importantly implicates pickering in the sense that while my colleague on the other side might say there's a difference between firefighters and police officers, that's for most purposes here a difference without a distinction, a distinction without difference in the sense that we're talking about first responders who are saving lives whose work depends on the goodwill and public trust of the community that they serve. Here, Mr. Inandino served in a predominantly minority community. And so when he is showing his disdain for, contempt for those individuals, that's particularly problematic for a department that is managing thousands of officers who, again, the extent to which an individual in that community, Englewood here, is likely to call an EMT for help, call the fire department for help, is very much dependent on whether they trust those EMTs to have their best interests at heart. So let's just back up for a minute and start maybe where counsel started in asking the question of is there a suggestion here is that because he was a firefighter that his Fourth Amendment rights were somewhat limited on his personal page? Do you mean First Amendment? First Amendment, uh-huh. To the extent that he's linking his behavior to his employer. So had this been, for example, a private— Say it one more time. To the extent he's linking his Facebook page to his employment as a firefighter. So he was standing as a firefighter. He's posting on his personal Facebook page as a Chicago firefighter? Not under Pickering Step 1. We're not saying that he was speaking as a government actor. We're saying that he is now implicating the fire department in a way that is particularly harmful for the fire department. He is not just the guy that is telling people to take their ass back over the border. He's the guy who has a real job whose picture on his Facebook is of him in partial uniform sitting on the back of a fire truck and whose Facebook that's public to anyone to see if you go and click on it. If I were told I've got a real job, someone had a real job, I'd be like, what's this real job you have? Pretty clear he's a firefighter. It says so on his page. And so in that case—and this is actually—we need look no further than the facts here where one of the individuals he was insulting said, quote, I have a lot of love for even the fire department, but if you don't see the problem with the situation, then you are part of the problem too. So individuals were not receiving his messages as just some angry individual on Facebook. They were receiving his messages as the angry individual who works for the real job at the fire department who clearly has no problem showing complete disrespect for these individuals. They do not know him. He does not know them. And that's why it's problematic. It's not that the fire department was simply—I mean, that's how this case came to be. The fire department was, in fact, the last to learn about this. These individuals reported his behavior to the OIG who conducted a very thorough investigation and then brought that information to the fire department. And then the fire department conducted interviews with him to make sure this wasn't just some one-off, we don't like this guy's speech. This is bad. Members of the public are raising the alarm. Would he be here if there was a disclaimer on his Facebook page that said, these are my views? Did he have to put a banner across the top of his Facebook page? As a matter of internal rules within the fire department, he did, though we would argue that would still be, as a matter of fact, just as problematic. Even if you say, I'm a member of the fire department, but these are my own views, and then you continue to go on and insult people with that nexus to your position.  but I think another point that your question raises is that he was violating a lot of rules, city rules, city personnel rules, fire department rules, and his willingness to act in violation of those rules in an organization that depends on the adherence to such order is also another sign that he may have not been unfit for the job. He may have been unfit for the job. Ms. Chapman, the other thing that kind of gnaws at me with regard to this case from the defendant's standpoint is what Ms. Herrera brought up, which is the time lag. So it's, you know, Mr. Nandino was terminated basically 19 and a half months after the first comments at issue in that give and take that we're talking about. And then it was eight months after the last offensive post that was set forth in the OIG report. What are we to make of that kind of time lag and the fact that there were no disruptions or no complaints during that time period when Mr. Nandino was terminated?    he wasn't taken off and put on leave or anything like that. And it seemed like things were just going along. Well, so as a matter of record here, there were only actually a couple months between when the fire department knew about the posts and took action. This was not brought to the fire department until March 29th of 2021. With that in mind, perhaps like the fire department gets this, they could have said, oh, there's no harm that's happened. And so I guess this won't happen in the future, but that would be overlooking the power and harm and risks inherent in social media. That would also be overlooking the fact that this has happened in the past and other public departments. It doesn't take a stretch of imagination to see a reporter scouring public employees, Facebook pages, social media, whatnot, and coming across posts from years earlier that has happened. And anything can go viral at any moment. So the time place and manner of the speech being on Facebook is particularly risky for the department. And furthermore, if the department had received this information reviewed, it said, I guess there's not any harm yet. I guess it's not reasonable for there to be more than it does come to light after that, that sends an even stronger message to the public, the fire department condones this type of behavior. So the fact that it had not yet been discovered is as a matter of fact, fortunate for the department, but it doesn't lessen the risk to the department. Anything else? We ask that this court affirm. Thank you. Ms. Herrera, we'll give you two minutes. Thank you. Looking at the pickering factors, was the employment relationship one in which personal loyalty was necessary? No. Did the speech impede Sam and Dino's ability to perform his job? No. What was the time, place and manner of the speech outside of work? What was the context in which the underlying disputes arose? It was a year and a half long stalking of his Facebook page during a period of major upheaval, not only in this country, but in the city of Chicago. Whether the matters were ones about which debate was vital to inform decision-making, he was posting about items of political news, including heated debates about police brutality, the maintaining of public order, race relations and city government, and whether the speaker should be regarded as a member of the general public. His speech was like anyone else's. He at no time said that he was speaking for the fire department and no one could reasonably believe that he was. We would ask this court to consider the Melton decision that recently came down that I filed a supplemental authority. The aid circuit got it right to say that just because something might cause some arguments at work, because some people might be offended by it, even that is not enough. In Melton, the phone lines were jammed with people calling saying, I don't want this fireman to respond to my house because he had posted something on Facebook that people thought was offensive. The aid circuit in Melton said, even that is not enough. An employee has the right to free speech and unless there's actual evidence that the employee was unable to do his job or unable to work with his coworkers, that his free speech rights trump the interests of the employer. As a reminder, Marvin Pickering in the 1968 case said, I am a teacher at the high school. In order to have first amendment protection, a government employee does not need to hide their identity. For these reasons and the reasons in my briefs, we ask that you reverse the judgment of the district court. Thank you. Thank you,  We'll take the case under advisement.